Please call the first case. You can both come and tell me your names and who you represent. My name is Kerry Getschner. I represent the people of the state of Illinois. Thank you. Good morning, your honors. As I just said, my name is Kerry Getsch, and I represent Karen Hand in this case. We're here this morning because Karen Hand's Fourth Amendment rights were violated, and also because she was criminally prosecuted for the events surrounding that violation. It's the state's position that the Fourth Amendment does not protect a woman like Karen Hand from unwanted intrusion into her home, so long as her drunken husband tells a police officer that, quote, the children are not eating based on some experiences he had in the past. The Fourth Amendment must require more than this. The right to be free from unreasonable searches and seizures has long been recognized as one of the most important rights held by civilized people. Under the state's reading, the right becomes an illusion. I'd like to focus most of my time on the first issue in my brief, because essentially the only issue in dispute in this case is whether Officer Kozlo was justified under the community caretaking exception to the Fourth Amendment in entering Karen's home when he initially entered the apartment. I know that you're all familiar with the facts, but the facts leading up to Kozlo's entry are really what's relevant in deciding whether his entrance was lawful under the Fourth Amendment. Karen was home alone with her two children when Kozlo knocked on the door. Her husband Frank had just left. He was drunk. They had been fighting about their financial situation. Frank spoke with Officer Kozlo. They lived there together, correct? They lived together at the time, correct. Okay, go ahead. I'm sorry. And Frank had spoken with the officer about, mentioned things such as sorcery, witchcraft, and also this quote that I mentioned that... Just to get you, you've mentioned several times that the husband was drunk. Is there, did Officer Kozlo say that he knew the man was drunk when he talked to him? Yes, he said he was obviously intoxicated. I guess there could be some degree above intoxication which would indicate drunk, but he was obviously intoxicated, so he was... But Counselor was able to get information out of him and... Correct. Information that seemed to be true. Some of it was true, correct? He said he was coherent and totally understandable, but that he was obviously intoxicated. Thank you, sir. So Officer Kozlo spoke with this intoxicated husband, and based on the husband's statement, primarily that the children were not eating based on experiences he had in the past, he tried to effect an entry. Kozlo opened the door, he knocked on the door, Karen was unresponsive after a brief, who is it? He went and spoke with the neighbor, and he used Frank's key to open the door. And the door was locked by a chair, a chair had been propped, a traditional... Mr. Goetz, I agree with you that the crux of your case is whether the community caretaking exception in this case applies. So, you know, let me ask you a couple of questions. The fact that Mr. Hand had given the officer his keys and asked him to go and check on his children, you know, what are you suggesting that the police officer should have done in that circumstance? Well, the issue isn't that Frank had asked the officer to check on his children. The quote that is in the record is that the children were not eating. And so you can infer that he had some concern about the children. But it's clear under the United States case of Georgia B. Randolph that even if Frank consents to Officer Kozlo's entry, Karen, being a present person in the apartment... I understand that, she can withhold her consent, but I think my question is a little different. Are you suggesting that the police officer should have disregarded the father's concern... No. ...and done something else? In your brief, you talked about getting a search warrant or, you know, calling DCFS or waiting until a later time. I mean, how would he assess that... I don't think... ...without having gone to the door or talked to the mother or some other opportunity to make an assessment of his own. Obviously, those actions were lawful and appropriate under the situation. I completely agree that knocking on the door, seeking to ask some questions is an appropriate action by a police officer in this situation. What's inappropriate is entering once Karen has expressed her consent. Well, now we're getting to the crux of it because he never got the opportunity to do that. The defendant, he never got an opportunity, as far as I can tell, to ask her anything. I mean, it seems like the whole situation quickly degenerated into something other than, let's ask questions about how the children are doing. Well, and then the question becomes, who do you place the burden on in that situation? Is it the person who's lawfully at home, just minding their own business? She has no idea that Frank called the police. She has no idea why Frank might have called the police. She's sitting at home. She doesn't necessarily even know that it's an officer at first. Well, he identified himself as a police officer. I know she said the porch was dark and she couldn't see, but at some point when he was inside halfway in the door, at that point he hadn't really gained entry, but the man was in full uniform. Well, for purposes of the Fourth Amendment, his entrance into the home had been affected at that point. But if you look at what happened prior to that, he was entering the home against her clear non-consent. So, yes, he was right in investigating or in seeking out further information, but in breaking into the home... My question is the same, though, Mr. Goetz. What should he have done? He could have just gone away and said, well, you know, she won't let me in, so I won't check on the kids tonight. I mean, what are you suggesting in the face of either complete refusal to cooperate or to give any information or just stonewalling? What's the police officer to do in a community caretaking situation of that nature? Just go away? If that's the case, the police would never be able to effectuate any kind of caretaking check on anybody. Well, he wouldn't have to go away, but he certainly couldn't break into the home. I mean, there's a difference between calling for a warrant, maybe, saying that he... Mr. Goetz, all I'm asking you is what are you suggesting other than what happened? And, you know, I think your opponent certainly takes issue with whether he, quote, broke into the home, but what are you suggesting should have been the... go away and come back with a warrant at another time? I'm not suggesting that he had to go away. He can call and ask for backup. He can get other officers to seek out a warrant based on... I don't believe he had enough information to get a warrant at that point. He had the protestations of a drunken husband. If that's enough to enter the home, then there really isn't anything preventing officers from entering the home. I mean, it could have been for purely harassing reasons that Frank called. And if it's enough to say that the children were possibly in danger, well, then Frank had committed a crime. Frank was just as responsible for these children as Karen was. Why does Frank get to get drunk and go outside and do all these other things and not be legally liable for the welfare of those children? That doesn't make any sense. Counsel, can I ask you, looking at the case of People v. McDonough, the Supreme Court has said the first law enforcement officer must be performing some function other than investigating a crime for an appropriate exception to the community care. Now, he was trying to do something other than investigate a crime, was he not, by checking on the children? If you look at the federal case law on this, and it's pretty clear, based on the cases that we cite, that investigating allegations of child abuse and neglect is intertwined with criminal investigation. So the federal courts are clear that you cannot enter the home to investigate these sort of things because under a community care taking function. If Frank had said something like, the children are being held at knife point, the children are in imminent danger of being hurt or maimed or the children haven't eaten for months and they're about to die, then, of course, the police are justified in effectuating this sort of forceful entry. But that's not the situation. So do we put the burden on the police officer to decide what range this is in versus the child not eating their lunch or not eating for three weeks? Why don't we put the burden on Frank to explain something more than he's concerned that the children are not eating based on... I mean, it's not even a contemporaneous concern. It's a concern that they might not be eating based on experiences he's had in the past. So put the burden on the complaining husband to provide more information to the police to where possibly the community care taking function would come into play. At this point, we're not putting any burden on Frank. We're saying, oh, Frank can say whatever he wants and then based on some sort of drunken protestorations that aren't even very clear, that Officer Kozula can break into Karen's home. That might be an extreme. But, I mean, that's really what he did. Karen locked the door, he opened it, said, I need to come in, let me in. She says, well, let me close the door and I'll room in the chair. And she closes the door, locks it again. I mean, that's pretty clear. I don't want you in here, you're not coming in. When did the bat come into play? Well, the bat was sitting there. I mean, you're making it sound like nothing else happened. Well, all the drama... The drunken husband says something and that's the end of the story. All the drama happens after Kozula has entered. So whether the initial entrance is lawful... So we should just ignore what happened thereafter? Well, it's a function of whether that initial entrance was lawful. And if you look at the Young case that we cite in the second issue, that case boils down to whether the police were there, whether they had entered lawfully. So they can't create exigencies is what it boils down to. And, yes, she had a bat there for protection. But if it wasn't a police officer, I don't think we would have this question as to whether she could swing and hit the door if someone else was trying to break into her house. And I guess the state assumes that she knew he was a police officer. We don't know the exact state of mind of Karen. She testified that she didn't know he was a police officer until he brought out the taser and tased her. And then she was well aware of it. Well, he testified that he identified himself as a police officer, so obviously the jury believed that testimony. Well, it's not exactly clear because she eventually says, yes, I knew he was a police officer once he brought out the taser. So the jury could have been basing it on her knowledge. What about People v. McDonough? Can you distinguish the facts of your case from that? Well, most certainly, because McDonough is along the lines of most of the cases cited by the state where the police are investigating a car along the side of the road, someone passed out behind the wheel of a car. McDonough isn't someone passed out, but they're parked along the side of the road. They weren't there 10 minutes earlier. And the police officer asked them if they needed help. That's community caretaking. Walking up, I mean, it's just like if someone was passed out on the street or sitting down on the street and looked in distress. If a police officer passes by them and says, wait, maybe they need help, and asks them, that's a consensual encounter and it's also community caretaking. Well, your argument, if I understand it, is based on what Frank said to the police officer and based on the fact that Frank had been drinking and further on the fact that Karen refused to cooperate, the officer should have just abandoned his community caretaking function and gone away. Is that what you're saying? Based on those factors, he had no right to continue to investigate further as to whether or not the children were in danger. What I'm saying is that warrantless entries into the home are presumptively unreasonable under federal Fourth Amendment law. We all know that, but I'm asking you very specific and narrow questions which you are not answering, and I know the law. I mean, I know what you're saying, and we can all agree that warrantless entries are not justified, but there are exceptions, so I'm just asking you to speak to those exceptions, not to the general breadth of the law. We're all familiar with that. And let me ask you another question. What about the state of the police officer's subjective state of mind? Is that relevant to the community caretaking exception under McDonough? Well, McDonough doesn't exclude consideration of the police officer's state of mind, but it says look at the objective facts. And I think in this situation, Kozula's statement that he wanted to investigate is just confirming what the objective facts suggest, is that he spoke with the drunken husband, was told this quote, that the children were not eating, and he went to investigate that. Well, there were some other facts that the husband talked about that would lead the police to believe maybe there was more going on in the home, but that coupled with the fact that he identified himself as a police officer, the woman refused to open the door, she then swung a baseball bat at him, all of those things, would that form some basis for his subjective conclusion that maybe I really do need to check on these children, this is not a normal situation? I mean, when a police officer knocks on your door and identifies themselves, most citizens wouldn't brace a chair under the door and then try to whack the police officer with a baseball bat. I don't, you know, would that be enough to form some subjective basis in the police officer's mind that maybe there is a real community caretaking issue that needs to be followed up on? Well, you have to remember that the bat swing was after the entrance, so he cannot create these exigencies. It's clear that a police cannot force his way into a home and then justify his entrance into the home based on the reaction of the homeowner. And to get back to your concern, what should he have done, all we're saying is he shouldn't have broken into the home. There's other steps, and I mean... What are some of the other things he should have done to check on the children other than get her to open the door? He could have called for backup. He could have asked other officers to obtain a warrant if he believed he had enough information based on Frank's statement and her refusal to speak with him. You conceded earlier, you said based on that, you didn't think he had enough information for a warrant.  How would he carry out the community caretaking function if she refuses to open the door, and based on the behavior, he believes that the children need to be checked on, what would he do? Well, if he believed that, then he must have had a reasonable suspicion that a crime had been committed, because... Not necessarily. What you're saying is that based on what Frank told him and her actions, that the children have been abused. No, I never said that at all. Well, then why would he be able to enter? I'm asking the questions, counsel, not you. Well, I mean, I think that boils down to it. Why is Officer Kozula allowed to enter Karen's home? Is it because he has concern for the children? Well, that, the federal courts say, is intimately intertwined with investigating criminal behavior. Maybe they're wrong. The federal courts are wrong? Yeah. I mean, that's obviously for you, your justices, to decide. Let me give you an example. Let's say you've got a senior citizen who is living by themselves in their 90s, and after a blizzard in Chicago, you realize they're having no footprints in or out for 10 days, and a neighbor calls and says, Officer, please, let's do a well-being check on this person. And they hear from inside the house, faintly, go away, go away. That officer would have no reason to enter into that home to try to save that person? I mean, where does this apply, then, the exception? It applies to situations where cars are parked along the side of the road or people are in obvious distress. That's it. It's a function completely divorced from investigation. If a neighbor calls and they're worried that their elderly neighbor is hurt, and the police knock on the door and someone says go away, then why would the police be concerned? Well, if someone hasn't been in and out of their home in 10 days. You're saying, I mean, the Fourth Amendment becomes completely irrelevant. The entrance into the home is, I mean, it's what the Fourth Amendment has most historically protected. We're saying that, yes, he has concerns, and, yes, maybe he should ask follow-up questions, but he cannot enter the home against her consent. I think what you're saying is that there is no community caretaking exception to the warrant requirement. I think that's what you're saying. That's not true at all. Well. You're limiting it, though, certainly. It's a very restrictive circumstance. It doesn't fit in this case. Just because we have children inside, we don't, he doesn't have any idea at this point, other than the fact that there are children there who may or may not have been fed for a day, a week, an hour, who knows. But doesn't that go to the whole point? Excuse me. Did I interrupt you? I'm sorry. Okay. That's not enough. Correct? That's your view. My view is if he does not know enough about the welfare of the children, that he cannot enter the house. He can't go in there to find out. Correct. Okay. Because he needs to know that it is sort of an emergency situation. And I think that most of my time is up. Thank you. Thank you, Counsel. Thank you. Good morning. May it please the Court. Assistant State's Attorney Noah Monaghan on behalf of the people on this matter. Your Honors, this matter comes before the Court today because a Riverdale police officer was asked to do a well-being check on the children of Frank Hand and the defendant and to do a well-being check on the defendant herself. Once on the scene, the officer was told that the kids weren't being cared for, weren't being fed, and that the defendant was mentally unstable, that she claimed to talk to the dead, she was claiming to be a sorceress, and that she was practicing some sort of witchcraft. Based on these statements and talking to Frank Hand, the husband, the officer could tell that he was intoxicated. However, the officer also testified that he was, quote, absolutely coherent. And frankly, it's not a crime for someone to drink, and it's also not an impediment to raising a concern about the safety of your children. The safety of the children of people who are intoxicated are not just left to the wind simply because that person gets intoxicated. Didn't the officer also go upstairs or something, check with somebody else? Yes. Yes, actually, and that's an important point in this case, Your Honor. That's why I mentioned it. Thank you. Thank you very much. And it is an important point because what this officer did was not simply based on these statements. And you can really see a deliberative and methodical approach to what the officer did in this case because he talked to the husband, and then he went and talked to a neighbor. He double-checked everything he could with the neighbor. Then he went and knocked on the door. He knocked on the door. He identified himself as a Riverdale police officer after the defendant said, who's there? But once he said he was a Riverdale police officer, she never spoke to him again. He knocked twice more. She didn't respond. Well, then he went back to the neighbor. Then he went back to the husband and got the key, and then he came back to the door. But he still didn't go in at that point. He knocked on the door again and said, I'm a Riverdale police officer. And you can look at the defendant's own testimony. She says, I heard him knock multiple times and go away. I heard him come back, knock, and I heard him identify himself as a police officer twice. Well, let me, is Karen, she also testified that there had been two or three occasions where unidentified men had come to the home knocking on the door and demanding to be let in in the recent past before this occurred. So, I mean, is her subjective belief that this was more of the same, you know, justifiable in deciding not to open the door to this police officer? Well, her subjective belief as to whether or not, you know, this was the same person that had caused these disturbances before doesn't weigh into the community caretaking analysis. Because under McDonough, what the court said was, hey, first of all, it's a completely objective analysis. And so what you're looking at is simply the objective facts. And just as one response. Well, my question actually goes to the specific crime of the aggravated assault that she was convicted of. If she had a subjective belief that this was, you know, that she was, quote, defending her home against, does that factor into that whether or not she is committing this crime if she's defending her home against, you know, some intruder? Well, if you're, what you're specifically referring to is Issue 2 of the Defense of Homes Statute, that actually, that statute says under it that in order to use the level of force she used, which was force likely to cause great bodily harm, you're swinging a bat at someone's head. Now, you have to have two things. One, you have to have a violent, riotous, or tumultuous entrance, which they did not have here. He used the key, and he stuck his head and his shoulder into the door and said, hey, I'm a police officer. Well, I think it was a little more than that, counsel. He used the key, but there was a, it sounds from the record, there was a considerable amount of pushing and shoving where he was trying to force the door open. She was trying to keep it closed by using a chair propped underneath it. So it was more than just turning the key and pushing it in and opening the door. Sure. But there is also a second factor that needs to be present in order to use force likely to cause great bodily harm, and that is a reasonable belief that the person coming in, that the force is necessary to prevent that person from attacking someone inside. And now this goes back to, well, her subjective belief doesn't really matter as far as those prior incidents because the objective facts are that she heard this guy identify himself multiple times as a police officer. When he's in there with his arm in the door in full uniform, she can certainly see that he's a police officer. And there's no reasonable belief that this police officer is coming in to attack her or attack her children. So there is a reasonable belief, and so that defense of home statute cannot apply. Now, for issue one, the people just wanted to respond to one thing counsel said, is that it is an objective standard under McDonough, and the officer's subjective statements really do not apply. And you see in McDonough it says, in making this determination, the court views the officer's actions objectively. And then it has a parenthetical that says, see Wren. And Wren, it quotes as saying, rejecting any argument, the constitutional reasonableness depends on the actual motivations of the individual officers involved. So that citation right there completely removes the officer's personal subjective motivations from this case. Counsel, can I ask you a question about the facts in the case? Yes. I don't recall. What was the time frame when the officer first announced his office, knocked on the door, to when the actual entry occurred? I believe it was just a few minutes. He knocked, announced his office. What happened, Your Honor, was he knocked, the defendant said, who's there? And he said, I'm a Riverdale police officer. I need to come in. She didn't respond, so he knocked twice more. He left. He talked to the neighbor and the husband and then came back. So it was a couple minutes. And her testimony as well concurred on that and said there was a couple-minute break where he went away. Right. So she would have had time to call the police herself if she wanted to. That's correct. And now, so when the officer then came back, he knocks again. She doesn't respond. And at that point, he has a choice to make. He can either walk away and leave the possibility that these children are in some trouble and just leave it and not do anything about it, or he can do something about it. And considering that the person stopped responding the second he said he was a police officer, the only reasonable thing he could do at that point was to use the key that had been given by the other resident and go in and check on the children. And the thing to see in this case is that McDonough really is the controlling case, and that's obviously why the people asked to cite it as additional authority. It came down after the briefs were filed on this case. And it says you need two things for community caretaking. You need a function other than investigating crime, which he had here, which was to do a well-being check, and you need to limit your acts to reasonable acts to protect safety. And while the entrance in this case, it's important to see how limited it is because all he did was turn the key and get his hand and his head in the door. That's all he did under the community caretaking exception. So it was a very limited entrance. This is not a case where there's some question as to whether or not the scope of the entry goes past the reasonable acts to actually do under the community caretaking exception. The other important thing to see in the case of People v. McDonough is that the Illinois Supreme Court in that case said that under the community caretaking exception, it's important that courts strike a balance between the individual citizen's interest in having their lives be free from interference of police and the public interest in having officers do these additional functions beyond investigating crimes. And it's obviously the people's position that looking after the health, safety, and welfare of children is a very strong public interest in this case, especially where children are really the most helpless members of our society. And children often can get caught in the middle of disputes between parents and adults and left behind and left unsafe. So, counsel, just one follow-up. Was there a less intrusive way for this officer to have gained entry into this woman's apartment? Not without risking the harm to the children. I mean, the only other thing he could do would be to leave and come back. But, you know, certainly defense counsel has said that there was not probable cause when he was at the door. So by that account, he couldn't get a search warrant. So how else could he do it? If he's not answering her at the door, she's not likely to answer a phone call. You know, Frank had been kicked out. The husband had been kicked out. And within 15 to 20 minutes of Frank being kicked out, she's at the door with a chair wedged under the door, a knife in her back pocket, and a baseball bat. You know, it's pretty clear that she wasn't letting anyone into this house. Really, the only response that this officer had was to go in. But he didn't know about the knife and the baseball bat until after he had gone in. No. What he knew was that the person was not responding. I mean, presumably, you know, at best he could have tried to negotiate some sort of compromise with her, I guess. But at that point, if someone stops talking to you, the minute you say you're a police officer, what do you expect to happen when you try and talk to the person? You try and reason with the person, the person's not responding to you. He didn't really have any other reasonable choices that wouldn't place the children at additional risk. So your answer is there was no less intrusive way for him to gain entry. That's correct. Counselor, can I ask you a question? Yes. In these domestic situations, and this was more than a domestic situation, but oftentimes one side says the other one's doing this and then police officers are kind of in a quandary as to what to do. Are you suggesting that in any domestic situation where one side says this one's doing something else in the home, the community caretaker exception applies? Well, the community caretaking would apply if there is an issue raised that is a function other than crime investigation. So if you have two disputing parents and one of them brings up some reason to do something for a police officer other than investigating a crime, and that under the community caretaking exception would allow the officer to do a very limited amount simply to protect safety. But, I mean, it's a very limited exception. It only allows a limited amount of action. But at this point it's a well-established exception. Now the other thing that people would like to note is that it's pretty clear here that once the officer had entered the apartment with his head and his shoulder and she swung the bat at him, it's pretty clear that he had probable cause that a crime had been committed and there were exigent circumstances to enter the apartment at that point. If you look at the seven factors for exigent circumstances, it was a recent crime, it was a violent crime, she was armed, there was no unjustified delay, and she was obviously on the premises. So that's five of the seven. The other two, peaceable entry and escape possible. I mean, the escape possible certainly should be considered that she tried to keep the officer out, but she tried to avoid contact with the officer. But those five strongly favor the exigent circumstances. One other thing that people wanted to point out here is that the remedy that the defendant is asking for here, even if it is supported by the case law that the defendant is saying, so even if the defendant's case law supports a finding that there was a Fourth Amendment violation, the case that the defendant cites is his main analogous case, People v. Klimek, I don't know if I'm pronouncing that right, K-L-I-M-E-K, also includes in it a statement that the exclusionary rule does not apply to misconduct done to police when they're entering, even when they're entering based on a Fourth Amendment violation. And it's part of the Klimek ruling that says, okay, we agree with the trial court that this was a Fourth Amendment violation, but we do not agree with the trial court's ruling that the exclusionary rule should apply to the evidence that the defendant battered the officers or the evidence that the defendant resisted the police officers once the officers were in the apartment. And so as defendant here on page 11 of his brief is saying that this court should reverse the trial court's ruling and exclude any evidence of the bat being swung in his head or her trying to grab the knife in her back pocket and resisting the officer. The people do not agree and do not think the defendant has met his burden of showing that, whereas the own case law that he cites shows that the exclusionary rule does not apply. And the people also cited the case of People v. Villareal. It's an Illinois Supreme Court case which dealt with the same thing. In both cases, Villareal and Klimek cite to the case of People v. Abrams. It's an Illinois Supreme Court case which decided that the exclusionary rule would not apply because of the policy reason that, hey, you're just going to incite lawlessness if you say that everything should be excluded, that even if someone's coming, the police are coming in for a wrong reason, if they're violating the Fourth Amendment to come in, the exclusionary rule should not apply to misconduct as a policy matter. And the people believe that Abrams should be followed here. Well, yes, sir. Please bring your remarks to a close. Yes. Your Honor, for these reasons as well as those stated in the People's Brief, we'd ask you to affirm the defense conviction. Thank you. Thank you. Thank you. Ms. McGaff, rebuttal, please. Thank you, Your Honors. Just one factual thing I'd like to clear up. I think in the record it's clear that Karen didn't have a phone. The phone had been disconnected because of their financial concerns, and Frank had a phone, a cell phone, obviously, but Karen didn't have a phone, so she couldn't call anyone. She couldn't figure out what was going on here. So that's clear in the record she did not have any kind of phone? Right. Cell phone. That's her testimony. So, you know, that she could have called for help or called the police herself was not really an option. And I guess I'd like to apologize for seeming a little bit over-emotional in my initial argument, but I find it, I mean, a little bit surprising that whether we look at the subjective concerns of the officer or the objective concerns, what this boils down to is the state is saying that the police have a right to enter the home under circumstances where all he's going on is that the husband says, I'm concerned the children are not eating based on experiences I've had in the past. And he doesn't say, I'm worried that the children are in immediate danger. I'm worried that the children are being hurt or, you know, it's a non-contemporaneous concern about possible malnourishment. Mr. Goetsch, the Supreme Court has said that the police have a right to enter the home under certain circumstances. I think what you and your opponent are arguing about here is whether the facts of this case fall within the parameters of the community caretaking exception. That's what you're arguing about. He says the facts fall within that exception. You say they do not. I understand your argument that that's what you're arguing about, but there are exceptions. That is an exception. The question is do the facts of this case fall within the parameters of that exception? That's all we're talking about here. Your argument, if taken to its logical extreme, as Justice Finesse pointed out before you, would say there are no exceptions to a warrantless entry ever, and that is not the law in this state. So I think what we're really looking at is are the facts of this case within the parameters of the community caretaking exception, nothing more, nothing less. That's what this case boils down to, as I understand it. And I apologize if that was the – my answer to your question was under the facts of this case, no, he could not have entered because he did not know. He didn't know enough. So, correct, under the facts of this case, where he didn't know the circumstances of the children's welfare, he could not enter. My suggestion wasn't that he could never enter. In a community caretaking situation, you never know. That's why you're looking into it to find out. When the police officer approached the driver parked in his car on the side of the road and he noticed that the car hadn't been there when he passed by ten minutes before, he didn't know whether the people were sick or what the story was, so he made an inquiry. So it's always going to be that situation where the police officer has to make some initial inquiry to find out is there a situation here that requires further community caretaking inquiry, and that's what happened here. And you're saying once the inquiry was rejected, he should have gone away. And your opponent is saying, well, the rejection of the inquiry and the manner in which it was rejected makes it really clear that he needed to continue inquiring. I mean, that's how I boil down your arguments. Well, it's clear in Donahoe that he didn't enter the car. He said that if he had given an okay sign and said we're fine, he would have left. The police officer testified to that. He got suspicious when the guy rolls his window down and smells like alcohol, and then a crime had been committed. If Officer Kozlo had opened the door and seen drug paraphernalia, then he could have entered for those reasons. But he had no reason to enter other than this statement. So we're really back to if the person refuses to cooperate and they just don't respond and they stonewall, then the officer has no recourse and he should just go away. That's basically what we're back to. And your opponent says that's not the law. And I don't understand that to be the law either. Any other questions? Thank you very much, Mr. Goetsch. Thank you, counsel. This matter will be taken under advisement.